UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
SOUTHEASTERN DIVISION

| | | |
|---|---|---|
| JASON DEMENT, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | Case No. 1:12CV00074 SNLJ |
| | ) | |
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Defendant. | ) | |

## MEMORANDUM AND ORDER

This case is a motion under 28 U.S. C. § 2255 to vacate, set aside or correct sentence by Jason Dement, a person in federal custody. On May 21, 2009, Dement was found guilty by a jury of the offense of being a felon in possession of a firearm and, on August 10, 2009, this Court sentenced Dement to the Bureau of Prisons for a term of 292 months, a sentence within the sentencing guideline range. Dement's § 2255 action, which is based on several allegations of ineffective assistance of counsel, is fully briefed and ripe for disposition.

## FACTS

### A.    The Indictment.

On January 15, 2009, a Grand Jury in the Eastern District of Missouri, Southeastern Division, returned an Indictment against Jason Dement, charging him with being a previously convicted felon in possession of three firearms that affected interstate commerce in violation of 18 U.S.C. § 922(g)(1). Dement was transferred from a Missouri Department of Corrections facility pursuant to a writ in order to face the federal charge. Dement's Initial Appearance was on February 2, 2009. The Federal Public Defender's office was appointed to represent Dement.

Dement was arraigned on February 5, 2009. At that arraignment, Dement pled not guilty to the charges.

### B. Pretrial Motions.

On March 2, 2009, Dement appeared with his attorney, Assistant Federal Public Defender Michael Skrien ("AFPD Skrien"), and waived his right to file pretrial motions. The case was then set for trial on April 29, 2009. The trial setting was changed on April 3, 2009, to a guilty plea hearing. On April 29, 2009, Dement appeared with his attorney and requested that his case be set for trial. This Court granted that request and set the case for a jury trial on May 21, 2009.

### C. Additional Evidence.

On May 18, 2009, the Government forwarded some additional evidence to AFPD Skrien that it had collected since Dement's indictment. That letter disclosed that Dement had made statements to other jail inmates that he would seek to harm some of the Government's witnesses or have drugs planted on them. The Government included copies of notes passed by Dement to these other inmates regarding those statements. Additionally, the Government included a copy of a recording of calls placed by Dement to his father from the Cape Girardeau County jail that contained an admission that he had possessed firearms.

On May 21, 2009, the Government filed its Trial Memorandum, setting out the facts it intended to introduce at trial. That Memorandum referenced the words spoken by Dement to his father on the recorded telephone call. A jury was selected and evidence presented. The Government rested after presenting its witnesses and evidence. The Government's evidence is set out below.

### D.    Government's trial testimony.

In the spring and summer of 2008, Cody Hofstetter was employed with Ozark Constructors, a heavy-equipment company engaged in helping rebuild the Taum Sauk reservoir in Reynolds County, Missouri. While he was employed there, Hofstetter became friends with a co-worker, Jason Dement. Hofstetter visited Dement at Dement's home in Lesterville, Missouri, several times a week. Hofstetter acquired four firearms during 2008 from local businesses. Those firearms were: (1) a Ruger, .22 caliber rifle; (2) a Remington, .22 caliber rifle; (3) an Iberia Arms, .40 caliber pistol; and (4) a Hi-Point, .40 caliber pistol. Hofstetter completed the ATF Form 4473 firearm purchase record for each purchase. The Ruger, .22 caliber rifle was distinctive in that it had a folding stock and was equipped with a red-dot, laser scope. (Tr., p. 49-56, 61.)

In June, 2008, Hofstetter's truck developed a transmission problem, requiring that Hofstetter leave the truck at Dement's house until Hofstetter could arrange to have it repaired. Dement gave his permission for the truck to be left at his house. Hofstetter left the truck, unlocked, at Dement's house, with the four firearms described above placed behind the truck seat. Hofstetter also left loaded ammunition clips and an extra box of .22 caliber ammunition in the truck. (Tr., p. 57-60.)

A couple of weeks later, Hofstetter returned to tow the truck to an Arcadia garage. He checked the truck and found that the firearms were missing. The clips and ammunition were also missing, except for the ammunition clip for the Remington rifle. Hofstetter spoke with Dement about the missing firearms. Dement stated that someone had stolen some of his things and that he thought this same person might have taken the firearms. Dement told Hofstetter that Dement

would "make it right." (Tr., p. 60,61.)

Dement made a telephone call to Paula Henson (Paula) during June, 2008. Dement is the nephew of Paula. Dement told Paula that he had some guns for sale and to relay that message to her husband, Halley Henson (Halley.) Dement stated that one of the guns had a brand name that began with the letter "I". (Tr., p. 103-105.)

Halley also worked at the Taum Sauk restoration project. Halley visited the Dement residence and spoke to Dement's wife, Nicki. Nicki told him that Dement had left something for Halley to look at. Halley went inside the Dement home with Nicki. Nicki then showed him four firearms lying on a floor. The firearms were a Ruger rifle, a Remington rifle, an Iberia pistol and a Hi-Point pistol. The Ruger rifle had a folding stock and was equipped with a red dot scope. (Tr., p. 113-116.)

Approximately a week after seeing the firearms, Halley met with Dement. Dement said that he had the Iberia, .40 caliber pistol for sale, but that he had traded the other pistol to Mark Maize for a four-wheeler. Halley purchased the Iberia pistol from Dement for $100. Later, Halley turned that pistol over to an ATF agent. It was the same pistol that had originally been purchased by Hofstetter. (Tr., p. 117-119.)

Around the first of July, 2008, Dement contacted Hofstetter. Dement stated that he had recovered one of the firearms and that Hofstetter could pick it up. Hofstetter obtained the firearm from Dement the next day. That firearm was the Remington, .22 caliber rifle. Dement said that he had obtained the firearm from a buddy who had retrieved it for Dement. Dement did not say anything to Hofstetter about any of the other three firearms. (Tr., p. 62-64.)

Near July 1, 2008, Dement drove his vehicle to the Reynolds County residence of Mark

Maize (Mark). Dement said that he had seen a four-wheeler in Mark's yard and was interested in trading a firearm for the four-wheeler. Dement said that he had three firearms for a possible trade, including a Hi-Point, .40 caliber pistol, a .22 caliber carbine and another firearm. Michael Durham was present during that conversation. (Tr., p. 76-78, 85, 86.)

A few days after the July 4, 2008, holiday, Mark drove to Dement's house with the fourwheeler in the back of his truck. Mark's brother, Andy Maize (Andy) went along on this trip. When the two men arrived at Dement's house, Dement was outside. Dement went inside his residence and came out carrying a Hi-Point, .40 caliber pistol. Andy test fired the pistol near the Dement house, with ammunition that Dement provided. After the test firing, Dement and Mark agreed to trade the four-wheeler for the pistol. Mark kept the pistol for a week, then he sold it to Durham. Durham kept it for another week, then he sold it to Patrick Maize. Patrick still had the firearm when he was interviewed by an ATF agent. Patrick surrendered the pistol to the agent during that interview. The pistol was identified by serial number as the same Hi-Point pistol as was purchased by Hofstetter. (Tr., p. 79-61, 85-96, Exhibits 2, 5.)

In July, 2008, Paula received another telephone call from Dement. Dement said that Nicki's father was angry with him and that he needed Paula to go to Dement's house and remove some firearms out of the bathroom closet. Paula said that she could not do this because of her work duties. Dement then asked where Paula's daughter, Kasie Sheets (Kasie) was. Dement called Kasie and asked her to go to Dement's house and retrieve the firearms out of his bathroom linen closet and to take them to Paula's business in Lesterville. Kasie did as she was asked. Later, Paula turned all of those firearms over to an ATF agent. One of the firearms was the Ruger, .22 caliber rifle that had been purchased by Hofstetter. (Tr., p. 96-99, 106, 107.)

In March, 2009, Dement was in the Cape Girardeau County Jail. That jail has a telephone system available to the inmates that records all telephone calls. The system provides a warning to both speakers that the calls are being recorded. During a telephone call that Dement made to his father, Dement said that he was charged with being a felon in possession of a firearm because "Paula and Halley and Kasie saw me in possession of a firearm." (Tr., p. 130, Exh. 7.)

Dement stipulated that, on the dates relevant to this offense, that he was a previously convicted felon. He also stipulated that the three firearms listed in the indictment were firearms and affected interstate commerce. (Trial Tr., pp. 47, 48)

### E.    Defendant's evidence.

Dement presented evidence after the Government rested, consisting of his testimony and his wife's. Dement's testimony was as follows:

Dement worked on the Taum Sauk Mountain reservoir restoration project with Cody Hofstetter. Both men were oilers on the cranes that operated at the project. Dement told Hofstetter about a house that Dement had just moved out of that might be for rent, as Hofstetter was looking for a place to live. After that, Dement and Hofstetter became friends. (Trial Tr., p. 142)

Dement testified that Hofstetter wanted to buy a motorcycle that Dement owned. Dement wanted to sell the motorcycle in order to be able to buy his son a car. However, Hofstetter could not assume Dement's loan on the motorcycle due to Hofstetter's bad credit. Hofstetter and Dement eventually agreed that Hofstetter would pay Dement a thousand dollars for the motorcycle. Dement wanted the payment to be made to the bank. Hofstetter said he would pay the money, but never did. The motorcycle was to remain registered in Dement's name. (Trial

Tr., pp. 143, 144)

When Hofstetter could not raise the remaining payment, Hofstetter brought four firearms to Dement's house and offered to give him the firearms as collateral to secure the payment. Dement testified that he rejected the offer of collateral. (Trial Tr., p. 145)

Dement testified that Hofstetter did not buy the pickup truck until sometime after June 26, which would have been after the time that Hofstetter testified that he left the truck at Dement's house. Dement stated that Hofstetter did not ever bring the truck to his house except one brief time when Dement was at work. (Trial Tr., pp. 147, 148)

Dement denied that he ever offered to sell Halley Henson a firearm. (Trial Tr., p. 148) He admitted that his wife, Nicky, kept some firearms in the house in a locked bathroom closet that Dement did not have access to. (Trial Tr., pp. 148, 149) Dement denied that he ever traded a firearm to Mark Maize. (Trial Tr., p. 149) He denied letting Andy Maize and Mark Maize target shoot a pistol at his residence. (Trial Tr., pp. 159, 160)

Dement testified that he and Halley Henson had a dispute that resulted in Dement being admitted to a hospital with a "possible gunshot wound." (Trial Tr., p. 152) Dement denied showing a firearm to Halley Henson for sale. (Trial Tr., p. 153) Dement stated that he, Paula Henson and Halley Henson were "pretty much at each other's throats," indicating that there was bad blood between the three of them. (Trial Tr., p. 155) Dement stated that he had been threatened many times by Paula Henson and Halley Henson and that Paula Henson "actually destroyed" the original wedding plans for Dement and Nicky. (Trial Tr., p. 156) Dement also testified that Halley Henson had raped his aunt, and had a "significant amount of drugs." (Trial Tr., p. 164)

**F.     Verdict.**

Dement rested and the case was submitted to the jury. The jury returned a verdict finding Dement guilty of the crime of being a Felon in Possession of Firearms. A sentencing date was set for August 10, 2009.

**G.     Presentence Investigation Report.**

A Presentence Investigation Report (P.S.R.) was prepared by United States Probation Officer Sherry L. Persinger. That report recommended that Dement's base offense level should be 26, pursuant to U.S.S.G., § 2K2.1(a)(A)(I) and (B), because the Ruger rifle was equipped with a high capacity magazine. Two levels were added because four firearms were involved in the offense, pursuant to U.S.S.G., § 2K2.1(b)(1)(A). Two levels were added because the firearms were stolen, pursuant to U.S.S.G., § 2K2.1(b)(4)(A). The Guidelines require that the defendant's offense levels total no more than 29 at this point in the calculation, therefore, one level added above was not added to the final total. Four levels were added because Dement possessed the firearms in connection with another felony offense, pursuant to U.S.S.G., § 2K2.1(b)(6). Two levels were added because Dement obstructed justice by testifying falsely at trial in that he denied possession of the firearms, contrary to the jury's verdict, pursuant to U.S.S.G., § 3C1.1. The total offense level was set at 35. (P.S.R., ¶ 18 - 27.)

Dement had previously been convicted of several felony offenses prior to this case. On May 9, 1995, Dement was convicted of the felony of Passing a Bad Check in the Circuit Court of Butler County, Missouri, in Case Number CR394-1485. Dement was sentenced to four years imprisonment for this conviction, however, that sentence was suspended and Dement was placed on probation for five years. That probation was revoked on September 13, 1995, and the original

four year sentence was imposed. Dement was paroled on September 12, 1996. His parole was revoked on October 10, 1996. Dement was paroled again on December 31, 1998. His sentence was completed on June 14, 1999. Dement received three criminal history points for this conviction. (P.S.R., ¶ 32 - 35.)

On November 16, 1995, Dement was convicted of the felony offense of Tampering - First Degree in the Circuit Court of Wayne County, Missouri, in Case Number CR1095-10. Dement was sentenced to a term of imprisonment of four years for this conviction. He was paroled on September 12, 1996. That parole was revoked on October 10, 1996. Dement was again placed on parole on December 31, 1998. His sentence was completed on October 30, 1999. Dement received three criminal history points for this conviction. (P.S.R., ¶ 36 - 39.)

On September 13, 1995, Dement was convicted of the felony offense of Escape From Custody in the Circuit Court of Butler County, Missouri, in Case Number CR395-1066. Dement was sentenced to a term of imprisonment of five years for this conviction. On September 12, 1996, Dement was paroled. That parole was revoked on October 19, 1996. Dement was again placed on parole on December 31, 1998. His sentence was completed on July 13, 2000. Dement received three criminal history points for this conviction. (P.S.R., ¶ 40 - 43.)

On February 11, 1997, Dement was convicted of the felony offense of Stealing Without Consent in the Circuit Court of Reynolds County, Missouri, in Case Number CR896-355. Dement was sentenced to a term of imprisonment of two years for this conviction. On June 6, 1997, his sentence was suspended and Dement placed on probation for five years. Dement received two criminal history points for this conviction. (P.S.R., ¶ 44 - 47.)

On October 31, 2003, Dement was convicted of the municipal offense of Operator's

License Required in the Municipal Court of Springfield, Missouri. Dement was sentenced to a term of imprisonment of 30 days for this conviction and was assessed one criminal history point. (P.S.R., ¶ 48 - 50.)

On June 6, 2000, Dement was convicted of the felony offenses of Second Degree Burglary, two counts, in the Circuit Court of Reynolds County, Missouri, in Case Number CR899-376. Dement was sentenced to a term of imprisonment of four years for this conviction. He was paroled on January 8, 2007, but that parole was revoked on August 8, 2008. Dement received 3 criminal history points for this conviction. (P.S.R., ¶ 51 - 54.)

On June 6, 2000, Dement was convicted of the offenses of Stealing Without Consent (one felony count and one misdemeanor count) in the Circuit Court of Reynolds County, Missouri, in Case Number CR899-333. Dement was sentenced to a term of imprisonment of four years for this conviction. He was paroled on January 8, 2007, but that parole was revoked on August 8, 2008. No criminal history points were assessed for this conviction, because it was considered a related conviction to the previous conviction listed above, pursuant to U.S.S.G., § 4A1.2(a)(2). (P.S.R., ¶ 55 - 58.)

On June 6, 2000, Dement was convicted of the felony of Escape From Confinement in the Circuit Court of Reynolds County, Missouri, in Case Number CR899-390. Dement was sentenced to a term of imprisonment of four years for this conviction. He was paroled on January 8, 2007, but that parole was revoked on August 4, 2008. Dement received three criminal history points for this conviction. (P.S.R., ¶ 59 - 62.)

Two criminal history points were added to Dement's score because the instant federal offense conduct occurred while Dement was on parole, pursuant to U.S.S.G., § 4A1.1(d). One

criminal history point was added because the federal offense occurred less than two years after

Dement's release from custody from his prior incarcerations, pursuant to U.S.S.G., § 4A1.1(e).

Dement received a total of 21 criminal history points, resulting in a Criminal History Category of

VI. Dement's range of punishment under the Sentencing Guidelines was 292 to 365 months.

(P.S.R., ¶ 65 - 68, 90.)

On August 4, 2009, Dement filed a Sentencing Memorandum in which he raised several

objections to the P.S.R. and requested a downward variance from the Guideline range of

imprisonment. Dement's objections to the P.S.R. were as follows: (1) Dement objected to the

description of the federal offense conduct as set forth in paragraphs 5 - 13 of the P.S.R., alleging

that he was innocent of the charge; (2) he objected to the base offense level of 26 as set forth in

Paragraph 18 of the P.S.R., alleging that the firearm was not stolen; (3) he objected to the four

levels added in Paragraph 19 due to four firearms being involved in the offense, as Dement

asserted at only three firearms should have been counted; (4) Dement raised an objection to two

levels being added because the firearms were stolen as set forth in Paragraph 20, alleging that the

firearms were traded between Dement and Hofstetter; (5) he objected to counting both

enhancements in Paragraphs 20 and 22 for the fact that the firearms were stolen and for

committing the offense of stealing the firearms, alleging that this was impermissible

doublecounting; (6) he objected to the enhancement for obstruction of justice in Paragraph 25 for

Dement testifying falsely at the trial; (7) he objected to P.S.R. finding that Dement was an Armed

Career Criminal as referenced in Paragraph 28 of the P.S.R. as that term is defined by U.S.S.G.,

§4B1.4, alleging that he did not have three prior convictions for violent felonies; and (8) he

objected to the mandatory minimum sentence applicable to his sentence as set forth in 18 USC §

924(e) as exceeding the minimum sentence necessary to accomplish the sentencing objectives. The Government filed its Response to Dement's Sentencing Memorandum on August 7, 2009.

### H.    Sentencing hearing.

On August 10, 2009, this Court conducted a sentencing hearing. This Court overruled Dement's first objection to the P.S.R., whether Dement was factually guilty of the offense charged, by relying on the jury's verdict finding Dement guilty. (Tr., p. 219) The Government introduced evidence to support the conclusion of the P.S.R. that each of the .22 caliber rifles had a large capacity magazine and that the base offense level as set forth in the P.S.R. was correct. (Tr., p. 221 - 233.) After hearing that evidence, this Court overruled Dement's objection as to the base offense level. (Tr., p. 238) This Court heard argument and overruled Dement's objections as to how many firearms were involved in the offense, finding that there were four firearms involved, and found that Dement stole the firearms. (Tr., p. 239, 240.) This Court further ruled that adding two offense levels for the firearms being stolen and four additional offense levels for Dement stealing the firearms was not double counting. (Tr., p. 240) This Court reviewed the transcript of Dement's testimony and found that Dement testified falsely concerning a material issue at the trial. Dement's objection to the enhancement for obstructing justice was overruled. (Tr., p. 240, 241.)

This Court then took up the issue of whether Dement was properly classified as an Armed Career Criminal. Dement argued that one of his escape convictions was a walkaway escape. The Government introduced the certified record of the conviction documents. After reviewing those documents, this Court found that Dement's prior escape conviction was a violent felony and not a walkaway escape and found that Dement was properly classified as an

Armed Career Criminal. (Tr., p. 241 - 244.) Finally, this Court overruled Dement's objection as to the statutory minimum punishment as required by 18 USC § 924(e) of fifteen years imprisonment. (Tr., p. 244)

After ruling on Dement's objections, this Court found that the Total Offense Level was 35, the Criminal History Category was VI and the Guideline range of punishment was 292 to 365 months, with a mandatory minimum sentence of fifteen years. (Tr., p. 244) Both parties made sentencing arguments, with the Government asking for a mid-range sentence of 328 months. (Tr., p. 245, 246.) Dement's attorney requested a sentence below the Guideline range as found by this Court. (Tr., p. 246, 247.) Dement spoke on his own behalf and requested that he be sentenced to serve his term of imprisonment in Teen Challenge. (Tr., p. 263)

After hearing arguments on the sentencing issues, this Court imposed a sentence of 292 months, to be served consecutively to the undischarged portions of Dement's state sentences. Dement was placed on supervised release for three years following his release from custody and ordered to pay a $100 special assessment. (Tr., p. 266, 267.) Neither Dement nor his attorney objected to any perceived procedural errors during the sentencing hearing.

**I.      The Appeal.**

On August 17, 2009, Dement filed a Notice of Appeal. Dement argued that the District Court committed sentencing procedure error in two ways: (1) that the District Court failed to give an adequate explanation for its imposition of a consecutive sentence, and (2) that the District Court failed to give an adequate explanation for its § 3553(a) analysis, resulting in an unreasonable sentence. On April 5, 2011, the Eighth Circuit Court of Appeals issued its decision affirming the sentence and judgment of the District Court, holding that there was no error

committed by that court in its sentencing of Dement. On June 9, 2011, Dement filed a pro-se

Petition for Rehearing. On July 8, 2011, the Eighth Circuit Court of Appeals denied the petition

for rehearing.

### J. Petition for Post-Conviction Relief Pursuant to §2255.

On May 4, 2012, Dement filed his Petition under 28 U.S.C. §2255, asking that this Court

set aside Dement's sentence. Dement set our several allegations of error that will be addressed in

turn.

## APPLICABLE LAW

### A. NEED FOR EVIDENTIARY HEARING AND BURDEN OF PROOF

28 U.S.C. §2255 provides, in pertinent part:

> Unless the motion and the files and records of the case conclusively show that the prisoner is not entitled to relief, the court shall . . . grant a prompt hearing thereon.

Rule 4(b) of the Rules Governing Section 2255 Proceedings for the United States District

Court states:

> The motion, together with all the files, records, transcripts, and correspondence relating to the judgment under attack, shall be examined promptly by the judge to whom it is assigned. If it plainly appears from the face of the motion and any annexed exhibits in the prior proceedings in the case that the movant is not entitled to relief in the district court, the judge shall make an order for its summary dismissal and cause the movant to be notified.

When a petition is brought under Section 2255, the petitioner bears the burden of

establishing the need for an evidentiary hearing. In determining whether petitioner is entitled to

an evidentiary hearing the court must take many of petitioner's factual averments as true, but the

court need not give weight to conclusory allegations, self interest and characterizations,

discredited inventions, or opprobrious epithets. *United States v. McGill*, 11 F.3d 223, 225 (1st

Cir. 1993). A hearing is unnecessary when a Section 2255 motion (1) is inadequate on its face,

or (2) although facially adequate is conclusively refuted as to the alleged facts by the files and the

records of the case. *Id.*, at 225-6. See also *United States v. Robinson*, 64 F.3d 403 (8th Cir. 1995)

*Engelen v. United States*, 68 F.3d 238, 240 (8th Cir. 1995).

When all the information necessary for the court to make a decision with regard to claims

raised in a 2255 motion is included in the record, there is no need for an evidentiary hearing.

*Rogers v. United States*, 1 F.3d 697, 699 (8th Cir. 1993). An evidentiary hearing is unnecessary

where the files and records conclusively show petitioner is not entitled to relief. *United States v.

Schmitz*, 887 F.2d 843, 844 (8th Cir. 1989); *Dall v. United States*, 957 F.2d 571, 573 (8th Cir.

1992).

## B.    INEFFECTIVE ASSISTANCE OF COUNSEL

To prevail on a claim alleging ineffective assistance of counsel, the movant must satisfy

the two-part test of *Strickland v. Washington*, 466 U.S. 668, 104 S.Ct. 2052 (1984). Under

*Strickland*, the movant must first show that the counsel's performance was deficient. 466 U.S. at

687. This requires the movant to show "that counsel made errors so serious that counsel was not

functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment." *Id*. Secondly,

the movant must demonstrate that the deficient performance prejudiced the defense so as "to

deprive the defendant of a fair trial, a trial whose result is reliable." *Id*. The movant "must show

that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the

proceeding would have been different. A reasonable probability is a probability sufficient to

undermine confidence in the outcome." *Id*. at 694.

The Eighth Circuit has described the two-fold test as follows: (1) counsel's representation fell below an objective standard of reasonableness; and (2) but for this ineffective assistance, there is a reasonable probability that the outcome of the trial would have been different. *Rogers v. United States*, 1 F.3d 697, 700 (8th Cir. 1993). More recently the Eighth Circuit has described the *Strickland* test as follows: "Whether counsel's performance was in fact deficient and, if so, whether the defendant was prejudiced by the inadequate representation. If we can answer 'no' to either question, then we need not address the other part of the test." *Fields v. United States*, 201 F.3d 1025, 1027 (8th Cir. 2000).

When evaluating counsel's performance, the court "must indulge in a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." *Strickland*, 466 U.S. at 689, 104 S.Ct. at 2065. Counsel's performance is considered objectively, and gauged "whether it was reasonable 'under prevailing professional norms' and 'considering all the circumstances.'" *Fields*, 201 F.3d at 1027, quoting *Strickland,* 466 U.S. at 688, 104 S.Ct. at 2064-65. Counsel's challenged conduct is viewed as of the time of his representation. "And we avoid making judgments based on hindsight." *Fields*, 201 F.3d at 1027. A reviewing court's "scrutiny of counsel's performance must be highly deferential." *Strickland*, 466 U.S. at 689, 104 S.Ct. at 2065.

## ARGUMENT

**Ground one.  Ineffective assistance of counsel.**
**Conflict of interest by failing to interview witnesses and investigate leads provided by Dement.**

Dement contends that AFPD Skrien was ineffective for failing to interview Government witness Cody Hofstetter and other witnesses prior to trial. Dement claims that if his attorney

would have investigated Hofstetter, he would have discovered that the Hofstetter vehicle "was never in front of [Dement's] resident or never in the state of Missouri at the time." (Dement's Memorandum; p. 4) Dement provides no other information that could have been discovered by an interview of Hofstetter.

This claim goes to the heart of Dement's defense at the trial; to discredit Cody Hofstetter. Dement now calls Hofstetter "the main government witness." (Dement's Memorandum; p. 3) Dement attempted to portray Hofstetter as unreliable, that Hofstetter's truck was never left in his driveway, that Hofstetter did not leave any firearms in the truck, etc. The problem with Dement's theory, and his defense at trial, was that Hofstetter was only a minor witness in the Government's case. Hofstetter testified that he had mechanical trouble with his truck and left it at Dement's residence until it could be fixed. Four of Hofstetter's firearms were left in that truck. When Hofstetter returned to claim his truck, the firearms were missing.

The only point of Hofstetter testifying was to establish the beginning point of the firearms that later were introduced into evidence in this case. Hofstetter did not see Dement taking any firearm and had no evidence that Dement was the person responsible for the theft. But other witnesses did. Paula Henson testified that Dement called her to inform her that he had some firearms for sale at around the time of the thefts. (Trial Tr., pp. 103-105) Her husband, Halley Henson actually went to the Dement home in response to that phone call to look at the firearms. Halley met with Dement's wife, who showed him four firearms that were for sale. The firearms were a Ruger rifle, a Remington rifle, and Iberia pistol and a Hi-Point pistol. These firearms matched the descriptions of the firearms that had been in Hofstetter's truck. (Trial Tr., pp. 113-116)

Halley Henson met with Dement about a week after seeing those firearms. Halley purchased the Iberia pistol from Dement for $100. Halley still had the pistol when this investigation started. Halley turned the pistol over to the officers. It was the same pistol that Hofstetter had purchased new. Hofstetter did not know Halley Henson. (Trial Tr., pp. 66, 117-119)

Mark Maize testified that Dement sold him a Hi-Point, .40 caliber pistol. Michael Durham was present when Dement spoke about selling the pistol. At a later date, Andy Maize and Mark Maize went to Dement's house to inspect the pistol. After test firing the weapon, Mark Maize purchased it. That pistol was later recovered by officers. Again, this pistol was a firearm originally purchased new by Hofstetter. (Trial Tr., pp. 76-96)

Hofstetter testified that Dement returned a Remington, .22 caliber rifle to him and said that Dement had recovered it from a buddy who had found it for Hofstetter. (Trial Tr.; pp. 62-64) Paula Henson testified that she recovered the other firearm, a Ruger, .22 caliber rifle, from Dement's house at his request. This rifle was also a firearm originally purchased new by Hofstetter. (Trial Tr.; p. 16-107)

Cody Hofstetter wasn't the main witness in the case; there were no "main" or primary witnesses. He was only the first witness. The other witnesses who said that they obtained firearms from Dement had nothing to do with Hofstetter. It is virtually impossible for Dement to provide an innocent reason why so many other persons could have seen him with these particular firearms. Dement focuses on one witness, Cody Hofstetter, but he ignores all the other witnesses who actually observed Dement in possession of these firearms. In fact, the Government's case could have been tried without even calling Hofstetter to testify since Dement's charged crime

was being a Felon in Possession of Firearms. The Government did not have to establish the originating point of the firearms, just Dement's eventual possession of them. Witnesses other than Hofstetter testified that they acquired two of the firearms directly from Dement. Dement would have been subject to the exact same punishment for possession of only one of those firearms as an Armed Career Criminal. In focusing on Hofstetter, Dement ignores the plethora of evidence that actually resulted in his conviction.

Furthermore, a reading of Dement's § 2255 petition seems to indicate that his attorney did not challenge the testimony of Hofstetter at all. The trial transcript reveals otherwise. The first series of questions asked by AFPD Skrien established that Hofstetter had a romantic relationship with Dement's wife, thereby impeaching his credibility and providing an illicit motive for his testimony. (Trial Tr.; p. 65) In his closing argument, AFPD Skrien pointed to discrepancies in Hofstetter's testimony and compared it to the testimony of Dement, arguing that Dement's version of disputed facts was the truthful version. He reminded the jury of the illicit relationship of Dement's wife and Hofstetter and argued that he was not credible. (Trial Tr., p. 200-208) In short, Dement's attorney impeached the Government's witnesses when he could. Even at this late date, Dement has not provided any factual information that could have been discovered by his attorney during a witness interview that wasn't found by him.

The Government provided the written reports of the statements of all witnesses early in this case to Dement. Dement made his initial appearance on February 2, 2009. A complete copy of the Government's Investigative file was provided to AFPD Skrien three days later, on February 5, 2009. That file contained summaries and hand-written statements of the Government's witnesses. The Government witnesses testified at trial consistent with those

statements. Dement presumes error by his attorney not interviewing these witnesses, but does not demonstrate any new fact that his attorney would have discovered or how that new fact would have helped his defense.

Dement has also ignored the fact that he testified in his defense and disputed much of Hofstetter's testimony, especially Hofstetter's testimony that he left his truck at Dement's residence. Dement testified that Hofstetter tried to trade Hofstetter's firearms to settle a debt between the two men, but that Dement refused the trade. (Trial Tr.; pp. 142-147) Dement denied that Hofstetter ever left his truck at Dement's residence; in fact, Dement testified that Hofstetter did not even own the truck at the time that Hofstetter said the firearms were taken. (Trial Tr.; pp. 147, 148) Dement denied having possession of the firearms and denied selling any of those firearms to any person. (Trial Tr.; pp. 152, 159) The jury heard all of the Government's evidence and Dement's evidence. However, the jury resolved the credibility issues in favor of the Government and against Dement, at least as to one firearm.

Additionally, AFPD Skrien prepared an affidavit that is attached to the Government's response to respond to the allegations in Dement's petition. AFPD Skrien stated that he did not interview the Government's witnesses because he assumed that they would testify consistently with their statements, which they did. AFPD Skrien knew that the evidentiary battle would be between the collective Government witnesses's credibility and Dement's. Interviewing the Government's witnesses would only have been a waste of Skrien's time confirming what they would have testified to. And Dement has not provided even a suggestion of any evidence that AFPD Skrien would have found had he interviewed those witnesses, other than to vaguely claim that his attorney could have discovered that Hofstetter's truck was not where he said it was when

the firearms were stolen. However, Hofstetter was subjected to extensive cross-examination and didn't yield on that issue. It is hard to imagine how an informal interview would have yielded better results for Dement than cross-examination. And, as a matter of trial strategy, some attorneys prefer not to interview witnesses, knowing that the witnesses will become educated as to their theory of defense and modify their answers accordingly. Many attorneys prefer to face their client's accusers for the first time at trial, when the witness has no idea what questions will be asked and what the theory of defense will be.

There are few "bright-line" rules for deciding ineffective assistance of counsel cases; each case must be decided on its own particular facts. *Payne v. United States*, 78 F.3d 343, 348 (8th Cir. 1996). The *Payne* Court noted that, even if Payne's attorney unreasonably failed to interview witnesses, Payne would still have to show a reasonable probability that, but for his lawyer's poor performance, his result would have been different. *Id.* Payne was unable to make this showing, just as Dement has failed in his Petition.

The defendant in *United States v. Davis*, 406 F.3d 505 (8th Cir. 2005), made a similar claim; that his attorney was ineffective for failing to interview witnesses. That Court noted that Davis's counsel used the witness's statements to cross-examine them, which also happened in Dement's case. The *Davis* Court found that Davis's attorney's performance was not ineffective and that Davis did not carry his burden to show that his conviction was the result of his attorney's poor performance. *Id.*, at 510.

Finally, Dement claims that his "counsel took no effect on the petitioner behalf" and that his "[c]ounsel prevented the petitioner from raising a reasonable defense." (Dement's Memorandum; p. 4) Whoever drafted Dement's § 2255 petition obviously was not aware of the

fact that Dement testified and that Dement's attorney vigorously cross-examined each of the Government's witnesses. Dement's claims fail when considered against the actual record made at trial.

Dement's conviction in not the fault of his counsel; his conviction was secured by the collective strength of the Government's witnesses. Dement finds blame with his counsel after his conviction, but he doesn't provide any cogent reasons why his attorney was at fault. Dement took his best shot at his trial and his conviction was justified by the evidence. His attorney was not ineffective.

**Ground two.  Ineffective Assistance of Counsel.**
**Counsel's Threats to Withdraw During the Pretrial Proceedings.**

Dement contends that his attorney threatened to withdraw during the pretrial phase of his federal prosecution. In his affidavit, AFPD Skrien denied threatening to withdraw as counsel, but confirmed that he and his client had differences as to the strategy that ought to be followed. Assuming, however, that AFPD Skrien did, in fact, threaten to withdraw as Dement's attorney during pretrial proceedings, Dement's motion in this regard should be dismissed for his failure to provide this Court with any connection with his counsel's alleged threat to withdraw during pretrial proceedings and Dement's conviction. Again, Dement alleges error without showing how he was prejudiced by this error.

Dement does not state that his attorney threatened to withdraw either before or during trial. There were no pretrial motions, so this perceived threat to withdraw could not have affected any hearing on those motions. Dement seems to contend that this threat has something to do with his attorney not interviewing witnesses, but does not show any connection between the

threat and the failure to interview. Dement's issue lacks factual support and, more importantly, fails to show how he was prejudiced. This portion of his motion is dismissed on that basis.

**Ground three.   Ineffective Assistance of Counsel.**
**Failure to Discuss Evidence.**

In this portion of his Memorandum, Dement makes a vague allegation that his attorney failed to discuss what evidence would be used at trial. This contention is ridiculous at best, and ingenious at worst, given that Dement testified extensively in his own behalf and called his wife to testify. The examination of Dement and his wife by AFPD Skrien shows that Skrien was fully prepared to ask any question of both witnesses to refute key portions of the Government's case. Both witnesses testified fully. Dement does not complain that his attorney left some important part out of his testimony or was unprepared. It is impossible for Dement's attorney to be unprepared and still yet be able to prepare his client for examination, along with Dement's wife.

Also, in this portion of his Memorandum, Dement mentions the fact that the Government played a portion of a jailhouse telephone recording between him and his father. Dement asks for discovery so that he could get a copy of the recording. As this Court is aware, the Government has previously mailed a copy of that recording to Dement. He has the materials that he requested.

Dement has failed to show factual error and has failed to show how he was prejudiced by this claimed error. This point is denied.

**Ground four. Ineffective Assistance of Counsel.**
**Failure to Request a Continuance or Object to the Introduction of the**
**Telephone Recordings.**

Dement now contends that his attorney should have requested a continuance when he learned of the existence of the telephone recording. He claims that his attorney acknowledged being surprised at trial upon learning of the recording. A review of the trial record reveals otherwise. The Government mailed a letter to AFPD Skrien, disclosing the existence of the recording on May 18, 2009. In addition, the Government filed a Trial Memorandum on May 20, 2009, in which the recording and its contents were described. And during a bench conference concerning the admissibility of the recording, AFPD Skrien made specific objections to the admission of parts of the recording. (Trial Tr.; pp. 124-126) AFPD Skrien noted that he had received his copy of the recording on May 18, 2009, and that he discussed the contents of that recording with Dement. Dement contends that his attorney was "surprised" when the Government introduced the recording, but the transcript, letter and documents establish that AFPD Skrien knew about the telephone recordings long before the trial and was prepared to deal with it. This point has no merit and is denied.

**Ground five.  Ineffective Assistance of Counsel.**
**Failure to Raise Issue on Appeal that the Government Failed to Comply With its *Brady* Obligations to Disclose the Recording.**

In this point, Dement contends that his attorney failed to appeal the Government's failure to disclose the telephone recording. Dement argues that the Government violated its duties under *Brady v. Maryland*, 373 U.S. 83, 83 S.Ct. 1194 (1963) by failing to turn over a copy of the recording to him or his attorney.

Under *Brady*, in order to obtain relief, the defendant must show that the prosecution suppressed evidence, the evidence was favorable to the defendant and the evidence was material to the issue of guilt or punishment. This includes both impeaching and exculpatory evidence.

Evidence is material only if there is a reasonable probability that, had the evidence been disclosed, the result of the proceeding would have been different. *United States v. Shepard*, 462 F.3d 847, 870 (8th Cir., 2006). *Brady* requires the Government to disclose any evidence that is both favorable to the accused and material either to guilt or punishment. *United States v. Anwar*, 428 F.3d 1102, 1112 (FN2) (8th Cir. 2005). Evidence that impeaches the credibility of a government witness falls under the *Brady* doctrine requiring the government's disclosure of material evidence favorable to the defendant. *United States v. O'Connor*, 64 F.3d 355, 358 (8th Cir. 1995). Information available from other sources or evidence already possessed by the defendant is not covered by *Brady*. *United States v. Gonzalez*, 90 F.3d 1363, 1368 (8th Cir. 1996).

Of course, this point is predicated upon Dement's false contention that the Government failed to deliver to his attorney a copy of the recording. According to the records and files in this case, this Court can and does conclusively find that Dement's attorney had a copy of this recording. Because AFPD Skrien was given a copy of the recording, there was no *Brady* violation and no grounds for appealing this issue.

**Ground six.**   **Ineffective Assistance of Counsel.**
                      **Failure to Have Dement in the Courtroom When the Telephone Conversation was Re-played at the Jury's Request.**

During their deliberations, the jury asked to hear the telephone recording again. This Court allowed the Government to play the recording for the jury. No further argument was permitted by either side after the recording was played. After hearing the recording, the jury retired to continue its deliberations. AFPD Skrien did not request that Dement be brought back into the courtroom for the re-playing of the recording for the jury. Dement now claims that this was error on the part of his attorney. Dement fails to demonstrate how the lack of his presence

for the replay of the recording somehow causes him to suffer some prejudice. He assumes that it did, but does not provide any connection between his attorney's acts and his conviction. Dement has not shown that his attorneys actions were error, or prejudicial to him. Without showing how the omission affected the verdict, Dement's complaint as to this issue is denied.

**Ground seven.   Ineffective Assistance of Counsel.**
                     **Failure to Challenge Prior Convictions as Violent Felonies.**

Dement argues that his attorney "offered no assistance to the petitioner during the sentence phase," and "acted as a mere spectator at the defendant's sentence." (Dement's Memorandum; p. 9) Dement appears to be objecting to whether his prior convictions qualified as violent felonies for purposes of his classification as an Armed Career Criminal.

Dement ignores the Sentencing Memorandum filed by his attorney, in which AFPD Skrien argued that Dement was not an Armed Career Criminal because he did not have the qualifying number of predicate, violent felony convictions. AFPD Skrien renewed these objections at the sentencing hearing and made the Government introduce the certified records of Dement's prior convictions in order to establish that he had three prior violent felonies. AFPF Skrien presented numerous objections to the Presentence Investigation Report. While those objections were eventually overruled, AFPD Skrien attempted to help Dement and required the Government to prove a great number of contested sentencing issues. (Trial Tr.; pp. 219-244)

Dement seems to contend that the Government was required to provide written plea agreements and plea colloquy transcripts of his prior state convictions in order to establish that those convictions were violent felonies. Of course, those records are not all that is allowed for that purpose; certified conviction records containing the charging information will also suffice.

Courts first look to apply the "categorical approach" articulated by the Supreme Court in determining whether a prior conviction was for a crime of violence (or violent felony) under § 4B1.2(a). *United States v. Vinton*, 631 F.3d 476, 484 (8th Cir. 2011). Under this approach, the sentencing court is generally prohibited from delving into particular facts disclosed by the record of conviction, thus leaving the court to look only to the fact of conviction and the statutory definition of the prior offense. *Id.*, citing *Shepard v. United States*, 544 U.S. 13, 17, 125 S.Ct. 1254 (2005). When a statute of conviction encompasses several different crimes, some of which qualify as crimes of violence and some of which do not, courts may use a "modified categorical approach" to determine which part of the statute was the basis for the conviction. *Vinton*, 631 F.3d at 484. Under the modified categorical approach, a court may examine the trial record, including charging documents, jury instructions, written plea agreements, transcripts of plea colloquies, and findings of fact and conclusions of law from a bench trial. *Id.,* citing *Shepard*, 544 U.S. at 20, 125 S.Ct. 1254.

This Court used the modified categorical approach to analyze Dement's prior convictions, as was approved by *Shepard.* This Court's sentence of 292 months imprisonment, which was within the applicable Guidelines' range as an Armed Career Criminal, was affirmed as "reasonable" by the Eighth Circuit. *See United States v. Dement*, 421 Fed.Appx. 655, 2011 WL 1237620 (8th Cir. 2011). Dement's classification as an Armed Career Criminal has been fully reviewed and was not error.

The Government submitted the certified conviction records of Dement to establish that both of his two felony escape convictions were true escapes and not "walkaway" escapes. Those records were sufficient to establish this fact at sentencing. No further records were required.

The record at sentencing clearly establishes that Dement's attorney provided good representation and was not "a mere spectator" as is claimed by Dement. His attorney was not ineffective.

**Ground eight.    Ineffective Assistance of Counsel.**
**Failure to Properly Impeach Government Witnesses Halley Henson and Paula Henson.**

Dement contends, in this final point, that his attorney was ineffective for failing to impeach the credibility of two of the Government's witnesses, Halley Henson and Paula Henson. Dement states that his attorney elected not to cross examine those two witnesses concerning an assault by them on him and that this "failure to challenge the credibility of the prosecution's key witness" was deficient. Dement closes by claiming that this failure was "prejudicial." Dement does not point out exactly how he was prejudiced by this omission; he merely assumes that he was.

Dement fails to recognize that his attorney impeached both witnesses as best he could during the trial. Paula Henson was questioned about her "bad feelings toward Dement's wife" (Trial Tr.; p. 108), about her attempts to "set Dement up with another woman" (Trial Tr.; p. 108), and about her memory of a telephone interview with an ATF agent (Trial Tr.; pp. 108-109). And the defendant testified extensively about his disputes and quarrels with the Hensons:

. . . that Dement did not offer to sell Halley Henson a firearm. (Tr. p. 148)

. . . that Paula Henson told Dement that his wife was seeing Hofstetter. (Tr. p. 151)

. . . that Dement and Halley Henson had a dispute and that this dispute involved

Dement being admitted to a hospital with a "possible gunshot wound". (Tr. p.

152)

. . . that there was bad blood between the Hensons and Dement. (Tr. p. 155)

. . . that Paula Henson threatened to take away Dement's wife's children. (Tr. p. 156)

. . . that Dement had been threatened "many times" by Paula and Halley. (Tr. p. 156)

. . . that Paula "destroyed his wedding." (Tr. p. 156)

. . . that Halley Henson had raped Dement's aunt. (Tr. p. 164)

Dement complains bitterly that his attorney failed to impeach Paula and Halley Henson. However, a review of the record reveals that Dement's attorney introduced quite a bit of impeaching information about both witnesses, much of which was completely irrelevant to the issues at trial. Dement testified that the Hensons did not like him and why. The jury simply did not believe him, or did not believe that this evidence made the Hensons not credible. But Dement cannot fairly criticize his attorneys efforts in impeaching witnesses. AFPD Skrien did his very best to attack the credibility of all of the Government's witnesses. In the end, the jury didn't believe Dement, which resulted in his conviction. Dement's attorney was not ineffective in his efforts to impeach witnesses.

**Dement's Request for Appointment of Counsel.**

Dement has filed a motion for the appointment of counsel. Because this Court determined there is no need to hold an evidentiary hearing, it is unnecessary to appoint counsel. Rule 8 - Section 2255 Proceedings. There are no disputes of fact that are relevant to this Court's ruling in that each of Dement's points can be decided against him by relying on the facts as asserted by Dement.

## CONCLUSION

Dement is only entitled to an evidentiary hearing when the facts alleged, if true, would entitle him to relief. *Payne v. United States*, 78 F.3d 343, 347 (8th Cir. 1996). However, a claim

may be dismissed without an evidentiary hearing if the claim is inadequate on its face. *Id*.

Dement's claims do not entitle him to relief. The evidence convicting Dement was

overwhelming. Dement has not shown any reason why there is a factual dispute requiring a

hearing, nor has he shown that he was prejudiced by his attorney's efforts or this Court's rulings.

Dement is not entitled to an evidentiary hearing on his claims.

For the foregoing reasons, Dement's § 2255 motion is **DENIED.**

**IT IS FURTHER ORDERED** this Court will not issue a certificate of appealability

because Dement has not made a substantial showing of the denial of a federal constitutional

right.

**SO ORDERED** this 12th day of September, 2012.

_____
STEPHEN N. LIMBAUGH, JR.
UNITED STATES DISTRICT JUDGE